Not for Publication

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HANG HING LOONG TRADING COMPANY LIMITED,<br><br>*Plaintiff*,<br><br>v.<br><br>INCO LIMITED LIABILITY COMPANY, a/k/a INCO L.L.C.,<br><br>*Defendant*. | Civil Action No. 15-3614 (JMV)<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

In this case, Plaintiff alleges that Defendant breached an agreement to repay millions of dollars. This matter comes before the Court on Plaintiff's motion for summary judgment brought pursuant to Federal Rule of Civil Procedure 56. D.E. 25.[1] Defendant filed a brief in opposition to Plaintiff's motion, D.E. 34, to which Plaintiff replied, D.E. 35. The Court reviewed all submissions, and considered the motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons that follow, Plaintiff's motion for summary judgment on Count One is **GRANTED**. Plaintiff's motion for summary judgment on Count Two is **DENIED**.

---

[1] In this Opinion, Plaintiff's brief in support of its motion (D.E. 29) will be referred to as "Pl. Br." Defendant's brief in opposition (D.E. 34) will be referred to as "Def. Opp. Br." Plaintiff's reply brief (D.E. 35) will be referred to as "Pl. Reply." Plaintiff separately docketed its motion for summary judgment (D.E. 25), its statement of material facts ("Pl. SOMF") (D.E. 28), and its brief in support of its motion ("Pl. Br.") (D.E. 29).

## I. FACTUAL BACKGROUND

Plaintiff and Defendant entered an installment contract signed by the parties obligating Defendant to deliver 500 metric tons of copper cathodes for over $3.6 million. Defendant did not deliver the product. The parties thereafter entered into a written agreement outlining how and when Defendant would repay the money. This dispute concerns Defendant's failure to abide by the repayment agreement.

### The Parties

Plaintiff Hang Hing Loong Trading Company ("Plaintiff") is a corporation formed under the laws of Hong Kong with its principal place of business in Yuen Long, Hong Kong. Pl. SOMF at ¶ 1. Jianhui Li ("Li") is Plaintiff's General Manager and owner. *Id.* at 2. Zhuosen Ye, also known as Vincent Ye, ("Ye") is Plaintiff's Director Manager. *Id.* at 3. Defendant Inco Limited Liability Company ("Defendant") is a New Jersey limited liability company with its principal place of business in Rochelle Park, New Jersey. Pl. SOMF at ¶ 4. Vincent Chou ("Chou") is Defendant's sole member and executive officer. Pl. SOMF at ¶ 5.

### The August 2009 Installment Contract

The facts surrounding the original contract between Plaintiff and Defendant are not in dispute. In August 2009, Plaintiff entered into an installment contract with Defendant to purchase 500 metric tons of LME registered grade "A" copper cathodes per month from Defendant ("August 2009 Installment Contract"). Pl. SOMF at ¶ 13; Def. SOMF at ¶ 7. Defendant completed deliveries to Plaintiff in September, October, and November 2009. Pl. SOMF at ¶ 14. In December 2009, Plaintiff pre-paid Defendant $3,656,049.14 for the next scheduled delivery due that month. Pl. SOMF at ¶ 15. There is no dispute that Defendant never delivered the December 2009 shipment. Pl. SOMF at ¶ 15. Defendant claims it was unable to deliver the December 2009

shipment "[d]ue to a positional hedging loss." Pl. SOMF at ¶ 17. Chou, Defendant's executive officer, agreed to re-deliver the December 2009 shipment at a later date, using the original payment as credit. Pl. SOMF at ¶ 19. However, by December 2010, Defendant had not delivered the replacement shipment and Li, Plaintiff's General Manger and owner, requested that Defendant return the prepayment. Pl. SOMF at ¶¶ 20-21.

## Winter 2011 Oral Agreement

It is at this point that the parties' versions of the events begin to differ. On December 8, 2010, Li (representing Plaintiff) and Ye (representing Plaintiff) met with Chou (representing Defendant). Pl. SOMF at ¶ 22; Def. SOMF at ¶ 12. Defendant states that during this meeting, Chou offered to turn over two of Defendant's bank accounts to Plaintiff—an account at Standard Bank (the "Standard Account") and a Lind Waldock account (the "Waldock Account")—but Defendant alleges that Plaintiff declined to accept the accounts.[2] Def. SOMF at ¶ 13. Defendant invested funds in the Standard Account and the Waldock Account pursuant to a "hedging" strategy in futures markets. Def. SOMF at ¶¶ 5-6. Defendant opened the Waldock Account in February 2010, Chou Decl. at ¶ 24, and the Standard Account in September 2010, Def. SOMF at ¶ 5; Chou. Decl. at ¶ 14.

Plaintiff claims that at the meeting, Chou confirmed that Defendant had received $3,656,049.14 from Plaintiff and offered to deliver 500 metric tons of LME registered grade A copper cathodes to Plaintiff within 12 months or return the prepayment. Pl. SOMF at ¶ 23. There were emails with promissory note proposals sent back and forth between representatives for Plaintiff and Defendant in December 2010 and January 2011. Pl. SOMF at ¶¶ 24-31. No

---

[2] Defendant claims that on December 8, 2010, the Standard Account had a balance of $1,956,896.16 and the Waldock Account had a balance of $646,064.70. Def. SOMF at ¶ 14.

agreement was signed, but Defendant orally agreed to return $50,000 each month to Plaintiff ("Winter 2011 Oral Agreement"). Pl. SOMF at ¶ 31. In February, March, and April 2011, Defendant made payments for a total of $150,000. Pl. SOMF at ¶ 32.

May 2011 Written Agreement

From May 1 to May 3, 2011, Li and Ye again met with Chou and asked for an accelerated repayment plan. Pl. SOMF at ¶ 33; Def. SOMF at ¶ 18. On May 4, 2011, Li and Chou entered into a written agreement (the "May 2011 Written Agreement") to return the money due. Pl. SOMF at ¶ 34.

The signed agreement is three pages long and, in relevant part, states:

> After 3 days of discussion between INCO LLC and Hang Hing Loong Trading Company Limited regarding [Inco's inability to deliver the December 2009 shipment] from May 1st to May 3rd, 2011, both parties have agreed that INCO LLC agrees to pay, the principal sum of $3,656,049.14 (23,764,319.41 RMB) by the end of 2012.
>
> INCO LLC will be required to make payments monthly with a minimum average of $50,000. INCO LLC will borrow funds to make the required payments from its shareholders' personal income. These payments are due on or before the last day on [sic] the month.
>
> INCO LLC has made 3 payments of $50,000 in February, March and April, total of $150,000 (975,000 RMB). This will be considered payment against the principal amount above. The current balance unpaid is $3,506,049.14 (22,789,319.41 RMB).
>
> In addition INCO LLC will make additional payments based on the following circumstances:
>
> 1. INCO LLC anticipates a projected net income directly from the position hedged from 825B of $800,000 to $1,000,000 for 2011. INCO LLC will pay 90% of this amount at year end.
>
> 2. INCO LLC will attempt to sell company assets not required for everyday operations including a 35% interest in Yantai Tri-Circle Lock Industry Limited.

INCO LLC estimates its interest to be worth $300,000 to $500,000.

3. INCO LLC will seek outside financing from financial institutions, private parties and shareholders up to $500,000 which will be used 100% in part of the payment plan to Hang Hing Loong Trading Company Limited.

INCO LLC anticipates total payments for 2011 between $1,700,000 and $2,000,000. The remaining balance would be paid in 2012.

D.E. 26, Ex. E.

Performance of May 2011 Written Agreement

Defendant did not make any of the future minimum monthly payments discussed in the May 2011 Written Agreement. Pl. SOMF at ¶ 48. However, in November 2011, Chou spoke to Li about the Standard Account. Def. SOMF at ¶ 19. Chou and Li agreed that Defendant would give $1 million to Plaintiff. Def. SOMF at ¶ 20; Li Decl., Ex. E, Chou Dep. at p. 82. Thereafter, Defendant paid Plaintiff $1 million in November 2011, as the first additional payment under the May 2011 Written Agreement, Pl. SOMF at ¶ 49, but Plaintiff did not make the second or third additional payment, *id.* at ¶¶ 50-51.

Defendant claims that Li and Chou agreed in November 2011 "that the balance of approximately $812,582.82 would remain [in] the Standard Bank account as 'seed money' for [Defendant] to try and make back [Defendant's] losses and make additional payments to Plaintiff." Def. SOMF at ¶ 20.

September 2012 Golf Outing

Defendant claims that in September 2012, Li and Chou played golf and had dinner together in China. Def. SOMF at ¶ 22. Defendant alleges that Li and Chou discussed the Standard Account and Chou told Li that the account had a balance of $1.4 million. Def. SOMF at ¶ 24. Defendant contends that Li told Chou to buy, rather than to short, his copper position. Def. SOMF at ¶¶ 25-

27. Defendant claims that Li declined Chou's offer to turn over the Standard Account to Plaintiff and Li stated that Chou should continue to invest the funds in a hedging account. Def. SOMF at ¶¶ 29-31. Defendant alleges that Li and Chou agreed on a strategy that entailed waiting to see how the current short position faired in the next few months, and if the position did not gain significantly, Chou would make the switch to long positions, as Li requested. Def. SOMF at ¶¶ 31-32.

Defendant further states that because the short positions had not gained significantly during the end of 2012, based on the parties' discussions during the golf round and at dinner, Chou changed the Standard Account positions from short to long. Def. SOMF at ¶¶ 34-35. Defendant claims that Chou was unable to make contact with Li, Def. SOMF at ¶¶ 36-37, but spoke to Ye in the summer of 2013 when Ye inquired about the status of the hedging positions, Def. SOMF at ¶¶ 38-39. Defendant states that at that time, Chou advised Ye that the Standard Account had lost some value. Def. SOMF at ¶ 38.

August 2014 Meetings and Letter

Defendant claims that Chou and Ye met twice in August 2014, first in New Jersey and then in New York. Def. SOMF at ¶ 40. Defendant claims that Ye told Chou that Plaintiff owed money to a bank and asked Defendant to provide a letter to the bank stating that additional payments would be made by Defendant to Plaintiff. Def. SOMF at ¶ 41. Defendant claims that Chou, Ye, and Li spoke on the phone to discuss the letter (the "August 2014 Letter"), Def. SOMF at ¶ 43, and to discuss the "Fishkill demolition project," which would possibly generate money that could be paid to Plaintiff, Def. SOMF at ¶ 45. Defendant claims that the August 2014 Letter "reflects

the parties' intention that payments to Plaintiff were conditional on the success of the Fishkill project."[3]  Def. SOMF at ¶ 45.

Defendant also claims that during these August 2014 meetings, Chou offered the funds in the Standard Account to Plaintiff, Def. SOMF at ¶ 50, and after taking to Li, Ye did not accept, Def. SOMF at ¶¶ 51-52.  Defendant claims that Chou was instructed to keep the money in the Standard account in hopes that the account would increase in value.  Def. SOMF at ¶ 53.

Defendant paid Plaintiff $200,000 in August 2014, Pl. SOMF at ¶ 46, which Defendant claims is consistent with the terms of the August 2014 letter, Def. SOMF at ¶ 47.  However, Defendant claims that the Fishkill project was halted and not resumed after September 2014.  Def. SOMF at ¶ 48.

---

[3] The letter, dated August 5, 2014, states:

> To whom it may concern:
>
> Re: Projected Payment Plan
>
> Based on the request of Hang Hing Loong Trading Company Limited and the amount owed by Inco LLC, hereby we plan to set up the payment schedule upon the completion of Fishkill demo project sales as follows:
>
> August 2014, INCO will remit $200,000 to Hang Hing Loong Trading Company Limited account [sic]
>
> September 2014, INCO will remit $200,000 to $250,000 to Hang Hing Loong Trading Company Limited account [sic]
>
> October 2014, INCO will remit $200,000 to $300,000 to Hang Hing Loong Trading Company Limited account [sic]
>
> Once the Fishkill demo project complete [sic], INCO LLC will remit all available profit to complete all remaining payment. [sic]
>
> On behalf of INCO LLC

D.E. 26, Ex. E.

<u>November 2014 Meeting</u>

Defendant claims that Chou and Ye met in New Jersey in November 2014. Def. SOMF at ¶ 54. Chou again offered the amounts in the Standard Account to Ye as a complete satisfaction of the money owed to Plaintiff. Def. SOMF at ¶ 56. Ye rejected this offer after speaking to Li. Def. SOMF at ¶¶ 57-58.

<u>Total Payments</u>

In total, Defendant paid Plaintiff $1,350,000.00, which is comprised of $50,000 payments in February 2011, March 2011, and April 2011, the $1 million payment in November 2012, and the $200,000 payment in August 2014. Pl. SOMF at ¶ 44. The remaining balance from the original $3,656,049.14 is $2,306,049.14. Pl. SOMF at ¶¶ 45-47.

## II. PROCEDURAL HISTORY

On May 29, 2015, Plaintiff filed its Complaint, asserting three counts. D.E. 1. Count One alleges breach of contract because Defendant violated the terms of both the May 2011 Written Agreement and the August 2014 letter. Pl. Compl. at ¶¶ 36-41. Count Two alleges Defendant breached the implied covenant of good faith and fair dealing in its dealings with Plaintiff because Defendant gave Plaintiff "specious 'explanations' for non-payment and, later, by engaging in subterfuges and evasions to destroy and injure the right of Plaintiff to receive the benefits of the contract." Pl. Compl. at ¶¶ 42-47. Count Three is a claim against Defendant for account stated in regards to the alleged remaining balance owed back to Plaintiff.[4] Pl. Compl. at ¶¶ 48-49.

---

[4] The numbering of Plaintiff's Counts in its Complaint is different than the numbering of Plaintiff's Counts in its motion for summary judgment. In Plaintiff's motion for summary judgment, Plaintiff states that Count One is for breach of contract and Count Two is for account stated. As noted by Defendant, Def. Opp. Br. at 16 n.4, Plaintiff's motion for summary judgment does not include any discussion of the Complaint's Count Two claim for a breach of the implied covenant of good faith and fair dealing.

On February 13, 2017, Plaintiff filed a motion for summary judgment. D.E. 25. On March 13, 2017, Defendant filed opposition, D.E. 34, to which Plaintiff replied. D.E. 35.

## III. SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). In other words, a court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits,

---

In this Opinion, the Court will use Plaintiff's numbering as reflected in Plaintiff's motion for summary judgment. In this Opinion, **Count One** refers to Plaintiff's action for breach of contract and **Count Two** refers to Plaintiff's action for account stated. The Court does not address the Complaint's claim for a breach of the implied covenant of good faith and fair dealing in this Opinion.

or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

## IV. ANALYSIS

The parties do not dispute that Plaintiff and Defendant agreed to the August 2009 Installment Contract, that Plaintiff prepaid Defendant $3,656,049.14 for the scheduled delivery of 500 metric tons of LME registered grade "A" copper cathodes in December 2009, and that Defendant did not deliver the December 2009 shipment. Moreover, the parties do not dispute the existence of the May 2011 Written Agreement and that Defendant did not make all payments to Plaintiff as required in the agreement. The dispute in the current motion centers on whether the May 2011 Written Agreement provides the operative binding terms upon which Defendant was to repay Plaintiff. Plaintiff claims that the May 2011 Written Agreement provides the binding terms. On the other hand, Defendant alleges that oral agreements made between the parties supersede the May 2011 Written Agreement.

Plaintiff argues that it is entitled to summary judgment on a number of grounds. First, Plaintiff argues that it is entitled to summary judgment on its breach of contract claim because there is no genuine issue of material fact that Defendant was in breach of the May 2011 Written Agreement. Pl. Br. at 2-14. Second, Plaintiff argues it is entitled to summary judgment on its claim for account stated because there is no genuine issue of material fact to the unpaid amount still owed to Plaintiff by Defendant. Pl. Br. at 14-15. Lastly, Plaintiff argues that it is entitled to an award of prejudgment interest under New Jersey law. Pl. Br. at 15-18.

Defendant, on the other hand, first contends that Plaintiff's claims are barred by the New Jersey statute of limitations. Def. Opp. Br. at 4-8. Second, Defendant argues an oral agreement that supersedes the May 2011 Written Agreement. Def. Opp. Br. at 9-12. Third, Defendant claims that Plaintiff failed to mitigate its alleged damages. Def. Opp. Br. 13-15. Fourth, Defendant argues that there is a genuine issue of material fact as to the amount that Defendant owes Plaintiff. Def. Opp. Br. at 16-19. Lastly, Defendant contends that even if Plaintiff is entitled to summary judgment, Plaintiff's request for prejudgment interest should be denied.

As an initial matter, the parties appear to assume that New Jersey substantive law applies to the alleged facts of this case. Seeing no clear reason to deviate from the parties' assumptions, the Court will apply New Jersey law. *See Manley Toys, Ltd. v. Toys R Us, Inc.*, 2013 WL 244737, at *2 (D.N.J. Jan. 22, 2013) ("Because the parties have argued the viability of the remaining claims as though New Jersey substantive law applies, the Court will assume that to be the case.") (citing *USA Mach. Corp. v. CSC, Ltd.*, 184 F.3d 257, 263 (3d Cir. 1999) ("[D]espite the interstate, and indeed international, nature of the putative transactions at issue, the parties have not chosen to address choice-of-law issues. . . . Because the parties appear to be in agreement on this issue, we will assume, without deciding, that Pennsylvania law supplies the appropriate substantive rules.")).

### A. Count One: Breach of Contract

Concerning the breach of contract claim, the Court will first address the statute of limitations and Plaintiff's alleged failure to mitigate damages. The Court will then address the May 2011 Written Agreement and whether it was superseded by an oral contract.

### 1. Statute of Limitations

Defendant argues that Plaintiff's claims should be barred by New Jersey's four-year statute of limitations on contracts for the sale of goods under N.J.S.A. 12A:2-725(1) and, therefore, Plaintiff's motion for summary judgment should be denied.[5] Def. Opp. Br. at 4-8. Defendant contends that the relevant starting date for calculating the statute of limitations is December 31, 2009 – the date on which Defendant failed to deliver the December 2009 shipment to Plaintiff based on the August 2009 Installment Agreement. *Id.* at 4. Plaintiff, on the other hand, responds that the relevant contract that Defendant breached is not the August 2009 Installment Agreement for the sale of goods. Rather, Plaintiff argues the pertinent contract is the May 2011 Written Agreement to repay Plaintiff – and therefore the alleged breach of that agreement is the relevant date for calculating the statute of limitations. Pl. Reply at 1-3. Plaintiff also contends that even if the original shipment contract is the relevant contract for calculating the statute of limitations, Defendant made partial payments before and after the expiration of the statute of limitations, thereby reviving the statute of limitations. Pl. Reply at 1-3.

Generally the a breach of contract claim in New Jersey is subject to a six year statute of limitations pursuant to N.J.S.A. 2A:14–1. However, a contract for the 'sale of goods' is covered by N.J.S.A. 12A:2-725's four-year statute of limitations. *Midland Funding LLC v. Thiel*, 446 N.J. Super. 537, 547 (App. Div. 2016).

---

[5] Defendant did not cross-move for summary judgment based on the statute of limitations.

N.J.S.A. 12A:2-725 provides, in part:

> (1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.
>
> (2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

Therefore, any actions based on a breach of a contract for sale of goods must be brought within four years of the breach.

The May 2011 Written Agreement is a valid contract. In fact, Defendant does not argue to the contrary.[6] In addition, because the contract concerns repayment of a debt (as opposed to the underlying installment contract, which dealt with the sale of goods), it is subject to a six-year statute of limitations, and Plaintiff filed within that time. Clearly, by May 2011, Plaintiff wanted its money back – not delivery of the goods under the original installment contract. Moreover, even if the four-year statute of limitations applied, the matter was still filed within the required time period. Giving Defendant the benefit of all favorable inferences, the May 2011 Written Agreement was not first breached until May 31, 2011,[7] when Defendant failed to make the required $50,000 payment. Plaintiff filed its Complaint on May 29, 2015 – which is within the four-year period.

---

[6] While Defendant never argues against the validity of the May 2011 Written Agreement, Defendant does allege that it was superseded by a verbal agreement. This argument is addressed below.

[7] It is not clear that this would be the correct date because Plaintiff did make a November 2011 partial payment of $1,000,000. *See Burlington Cty. Country Club v. Midlantic Nat. Bank S.*, 223 N.J. Super. 227, 235 (Ch. Div. 1987) ("Payment of or an account of a debt or obligation may also

Defendant nevertheless claims that the August 2009 Installment Agreement controls for statute of limitations purposes because the May 2011 Agreement was based on, and derivative of, the 2009 contract. Def. Opp. Br. at 4. While this argument is at best questionable, the May 2011 Agreement would nevertheless renew the statute of limitations period. If a new agreement qualifies under N.J.S.A. 2A:14-24, the original statute of limitations for the underlying breach will no longer apply. N.J.S.A. 2A:14-24 provides, in part:

> In actions at law grounded on any simple contract, no acknowledgment or promise by words only shall be deemed sufficient evidence of a new or continuing contract, so as to take any case out of the operation of this chapter, or to deprive any person of the benefit thereof, *unless such acknowledgment or promise shall be made or continued by or in some writing to be signed by the party chargeable thereby.*

(Emphasis added).[8] N.J.S.A. 2A:14-24 "prescribes the standards by which acknowledgement of a pre-existing debt or promise can serve to set aside the statute of limitations bar." *Ong v. Ong*, 2011 WL 2377900, at *3 (N.J. Super. Ct. App. Div. May 19, 2011).

The May 2011 Written Agreement is unquestionably an acknowledgement, in writing, by Plaintiff that he owed the debt. As a result, N.J.S.A. 2A:14-24 applies, and the statute of limitations

---

toll or revive the statute of limitations, thereby extending it for the statutory period from the time of such payment.").

[8] As indicated in note 7, under New Jersey law, "[p]ayment of or an account of a debt or obligation may also toll or revive the statute of limitations, thereby extending it for the statutory period from the time of such payment." *Burlington Cty. Country Club v. Midlantic Nat. Bank S.*, 223 N.J. Super. 227, 235 (Ch. Div. 1987). "When a partial payment is made after the statutory period has run, the party seeking to revive the statute must show (1) that the payment was partial, and (2) an act or declaration which establishes the debtor's recognition of, and intention to pay, the entire claim." *Burlington Cty. Country Club*, 223 N.J. Super. at 235. The New Jersey courts have made clear that there must be an intention to pay the entire debt, and that "mere payment is not enough." *Burlington Cty. Country Club*, 223 N.J. Super. at 236 (citing *Romaine v. Corlies*, 47 N.J.L. 108, 109 (Sup. Ct. 1885)). In *Romaine*, the court held that "[i]t must appear that the payment is made only as part of a larger debt, for in the absence of such evidence it will be deemed an admission of no more indebtedness than it pays." *Id*. at 109.

also began anew on the date that the agreement was signed. FAC at ¶ 77. Defendant cites one case, *Custom Commc'ns Eng'g, Inc. v. E.F. Johnson Co.*, 269 N.J. Super 531 (App. Div. 1993), in support of its contention that the underlying August 2009 Installment Agreement is the relevant contract for calculating the statute of limitations. However, that case is inapposite. In *Custom Communications*, the court found that a number of claims were time barred by the four-year statute of limitations. *Id.* at 541. But, in *Custom Communications*, there was no subsequent agreement; instead the breach was based on the original contract.

Therefore, there is no genuine issue of material fact that would preclude summary judgment on statute of limitations grounds.

### 2. Failure to Mitigate Damages

Defendant also claims that even if Defendant is found to be in breach of the May 2011 Written Agreement, Plaintiff's motion for summary judgment should be denied because Plaintiff failed to mitigate its damages. Def. Opp. Br. at 13-15. Defendant argues that Chou made several attempts to turn over hedging accounts to Plaintiff and that Plaintiff rejected these offers, instead instructing Chou how to invest the money in the Standard Account.[9] Defendant argues that this

---

[9] Specifically, Defendant claims that Chou offered four times to let Plaintiff take over the Standard Account (and in one case the Waldock Account) or to turn over the proceeds from the Standard Account without requesting a release of Defendant's obligation to Plaintiff. Defendant alleges that the amount in the account(s) at the time of the offers were: (1) $1,956,894.16 (Standard Account) and $646,064.70 (Lind Waldock Account) in December 2010; (2) between $719,200.21 and $1,409,380.82 (Standard Account) in May of 2011; (3) $1,400,000 (Standard Account) in September 2012; (4) more than $900,000 (Standard Account) in August 2014. Def. Opp. Br. at 14; D.E. 34, Chou Decl. at ¶ 27, 28, 37, 55.

Defendant also alleges that Chou offered to liquidate the Standard Account a fifth time and give the approximately $700,000 proceeds to Plaintiff in November 2014. However, this offer was conditioned on Plaintiff relieving Defendant of the remaining amount owed. D.E. 34, Chou Decl. at ¶¶ 64-66 ("I told [Ye] that if they wanted to liquidate the Standard Account, Inco's sole asset, they would have to agree not to ask me or Inco for any more money.").

constitutes a failure to mitigate damages. Def. Opp. Br. at 13-15. Plaintiff counters that the doctrine of the duty to mitigate is inapplicable to this case because there was no new additional damage when Plaintiff declined to take over the hedging accounts and because Plaintiff had no duty to take less than the total amount owed by Defendant. Pl. Reply at 7-9.

Under New Jersey law, "[i]t is well settled that injured parties have a duty to take reasonable steps to mitigate damages." *McDonald v. Mianecki*, 79 N.J. 275, 299 (N.J. 1979). "Damages will not be recovered to the extent that the injured party could have avoided his losses through reasonable efforts 'without undue risk, burden or humiliation.'" *Ingraham v. Trowbridge Builders*, 297 N.J. Super. 72, 82–83 (App. Div. 1997) (quoting Restatement (Second) of Contracts, Section 350(1)-(2) (1981)). The duty to mitigate "is based on the premise that a plaintiff may not recover damages for injuries which he may have avoided."[10] *Russo Farms, Inc. v. Vineland Bd. of Educ.*, 144 N.J. 84, 108 (N.J. 1996) (internal quotations omitted).

Here, Defendant argues that Plaintiff failed to mitigate its damages because Plaintiff did not accept the Standard Account when the account had a large sum of money in it. However, this contention misstates the scope of a party's duty to mitigate damages. While "[i]t is well settled that a party claiming damages for a breach of contract has a duty to mitigate his loss," *Sommer v. Kridel*, 74 N.J. 446, 454 (N.J. 1977), the non-breaching party is still "entitled to the amount of damages . . . which . . . will put that party in the same position it would have been in if the breaching party had performed the contract in accordance with its terms," *Magnet Resources, Inc. v. Summit MRI, Inc.*, 318 N.J. Super. 275, 292–93 (App. Div. 1998). Here, Plaintiff did not increase the

---

[10] "The doctrine is particularly applicable to an employment contract wherein the discharge of a full-time employee frees him to earn moneys for his personal services." *Sandler v. Lawn-A-Mat Chem. & Equip. Corp.*, 141 N.J. Super. 437, 455 (App. Div. 1976), *holding modified by Ellmex Const. Co. v. Republic Ins. Co.*, 202 N.J. Super. 195 (App. Div. 1985).

damages it was owed; rather, Plaintiff chose to not accept accounts with less than the total amount allegedly owed by Defendant. A non-breaching party must not act unreasonably in rejecting adequate substitutes, but it is "not required to compromise its debt to mitigate its damages." *Valley Nat'l Bank v. Fister*, 2017 WL 476149, at *3 (App. Div. Feb. 6, 2017) (finding that a bank was not obligated to agree to proposed sales of a property to resolve the deficiency in a foreclosure proceeding when the bank would be compromising the amount of its deficiency claim). Here, Plaintiff was under no obligation to accept accounts with less than the total alleged amount owed by Defendant. While it is true (and unfortunate for both parties) that Defendant's accounts subsequently lost value, this cannot be legally attributed to any of Plaintiff's acts. Defendant essentially argues that because Plaintiff gave Defendant unwise instructions on how to invest Defendant's remaining assets, Plaintiff failed to mitigate its damages. Of course, there was nothing preventing Defendant from liquidating its account (regardless of Defendant's advice)[11] and making a partial payment to Defendant. But in such a scenario, Defendant would have still owed the remaining amount to Plaintiff absent an agreement to the contrary.

Applying the duty to mitigate to the facts of this case would fundamentally misapply the doctrine. Therefore, the Court denies Defendant's request to deny summary judgment based on Plaintiff's failure to mitigate.

### 3. The May 2011 Written Agreement

Plaintiff argues that summary judgment is appropriate on its claim for breach of contract in regard to the May 2011 Written Agreement because there is no genuine issue of material fact

---

[11] Defendant appears to be making some form of estoppel argument concerning its detrimental reliance on Plaintiff's instructions to continue hedging the money. But Defendant did not raise estoppel by way of either counterclaim or affirmative defense.

that the valid and binding contract was signed by both Plaintiff and Defendant and that Defendant

breached the contract. Pl. Br. at 2-14.

To establish a breach of contract under New Jersey law, a plaintiff must demonstrate that

there is (1) a valid contract; (2) plaintiff performed under the contract; (3) defendant's breach of

the contract; and (4) resulting damages. *Lacroce v. M. Fortuna Roofing, Inc.*, 2017 WL 431768,

at *5 (D.N.J. Jan. 31, 2017); *Murphy v. Implicito*, 392 N.J. Super. 245, 265 (App. Div. 2007) (To

establish a breach of contract under New Jersey law, "a plaintiff has the burden to show that the

parties entered into a valid contract, that the defendant failed to perform his obligations under the

contract and that the plaintiff sustained damages as a result."). Defendant does not challenge the

existence of the May 2011 Written Agreement between the parties,[12] nor does Defendant dispute

that it did not follow the repayment plan described by the May 2011 Written Agreement.[13] Rather,

Defendant bases its opposition to summary judgment on the existence of superseding oral

agreements between the parties. Because there is no dispute that the parties entered into the May

---

[12] Defendant notes that the May 2011 Written Agreement "reflects a memorialization of [Defendant's] projected repayment or refund of Plaintiff's December 2009 Payment for the goods it did not receive from [Defendant]. Under the [May 2011 Written Agreement], [Defendant] had agreed to return Plaintiff's full payment under certain conditions. No additional consideration from either party was recited in the [May 2011 Written Agreement]. Thereafter, the projected repayment terms under the [May 2011 Written Agreement] were superseded by the oral agreement of the parties." Def. Opp. Br. at 9.

While Defendant briefly states that there was no additional consideration in the May 2011 Written Agreement, Defendant focuses its arguments on the validity of alleged superseding oral agreements; beyond its brief mention of lack of consideration, Defendant does not attempt to argue that the May 2011 Written Agreement was invalid at the time it was signed. Moreover, Defendant does not explain why the 2011 Written Agreement lacks consideration. One obvious form of consideration is that Defendant was not forced to pay all the money back at once. Another is that Plaintiff did not sue Defendant for the outstanding amount. Yet another is that Plaintiff did not seek interest on the amount owed.

[13] Defendant states that "[t]here is no dispute that [Defendant] immediately did not make the monthly payments under the [May 2011 Written Agreement]." Def. Opp. Br. at 9.

2011 Written Agreement and that Defendant failed to perform under the contract, the Court now moves to examining whether the parties entered into a subsequent and superseding oral agreement that modified Defendant's duties.

### 4. Oral Agreements

Defendant claims that the May 2011 Written Agreement was superseded by subsequent oral agreement of the parties. Def. Opp. Br. at 9-12. Specifically, Defendant points to events during two time periods to support its claims: November 2011 and September 2012. Defendant first alleges that in November 2011, Li and Chou agreed that the parties would leave money in the Standard Account as "seed money" so Chou could attempt to make up for the parties' losses. Def. Opp. Br. at 9; D.E. 34, Chou Decl. at ¶¶ 32-35. Second, Defendant claims that in September 2012, Li and Chou again discussed the strategy of the Standard Account and that Li (and "Mrs. Li") "insisted that the parties maintain their joint strategy to use the account to attempt to earn back all of their losses," Def. Opp. Br. at 9-10, instead of cashing out the account and give the funds to Plaintiff,[14] Def. Opp. Br. at 11. Defendant contends that these two events are evidence of an oral agreement (to jointly invest the Standard Account) that supersedes the May 2011 Written Agreement. Def. Opp. Br. at 11. Plaintiff, on the other hand, argues that the parties did not come to a legally binding oral agreement to modify the terms of the May 2011 Written Agreement. Pl. Reply at 3-4.

Defendant is correct that the parole evidence rule would not bar evidence of any superseding oral agreement made *subsequent* to the May 2011 Written Agreement, however, to defeat summary judgment Defendant must provide some evidence that there was such an oral

---

[14] As mentioned in note 11 *supra*, Defendant appears to be raising some form of estoppel argument, but Defendant did not raise estoppel in its Answer and did not actually argue it in its opposition to the current motion.

agreement between the parties. Here, Defendant has failed to provide sufficient evidence to show a genuine issue of material fact regarding the existence of *a valid* oral contract between Plaintiff and Defendant that supersedes the May 2011 Written Agreement.

"A contract arises from offer and acceptance, and must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (N.J. 1992) (quoting *Friedman v. Tappan Dev. Corp.*, 22 N.J. 523, 531 (N.J. 1956)) (other citations omitted). "Thus, if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract." *Weichert Co. Realtors*, 128 N.J. at 435. "An essential characteristic of an enforceable contract is that its obligations be specifically described in order to enable a court or a trier of fact to ascertain what it was the [promisor] undertook to do." *Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank*, 163 N.J. Super. 463, 474 (App. Div. 1978) (citations omitted), *certif. denied*, 79 N.J. 488 (N.J. 1979).

Defendant essentially argues that, without specifically mentioning the term, a novation occurred. "[A] novation substitutes a new contract and extinguishes the old one." *Wells Reit II-80 Park Plaza, LLC v. Dir., Div. of Taxation*, 414 N.J. Super. 453, 466 (App. Div. 2010). Under New Jersey law, "[t]he elements of a novation are: (1) a previously valid contract; (2) an agreement to make a new contract; (3) a valid new contract; and (4) an intent to extinguish the old contract." *Id*. Regarding the fourth element, "[i]n order to effect a novation there must be a clear and definite intention on the part of all concerned that such is the purpose of the agreement, for it is a well settled principle that novation is never to be presumed." *Id*. at 467 (quoting *Sixteenth Ward Bldg. & Loan Ass'n v. Reliable Loan Mortgage & Sec. Co.*, 125 N.J. Eq. 340, 342–43 (E & A. 1939). While New Jersey courts have cautioned that the existence of a novation is generally a question of

fact to be presented to the jury," *Wells Reit II-80 Park Plaza, LLC*, 414 N.J. Super. at 467, "when the evidence is 'one-sided' regarding whether the parties entered into a novation, summary judgment is appropriate, *id.* (citing *Tung v. Briant Park Homes, Inc.*, 287 N.J. Super. 232, 239 (App. Div. 1996)).

Here, Defendant claims that Chou's deposition testimony and statements in Chou's Declaration describing discussions between Li and Chou in November 2011 and September 2012 show that Defendant's repayment "was no longer governed by the [May 2011 Written Agreement], but was either governed by, or entirely contingent upon, the parties' joint investment in the [Standard Account]." Def. Opp. Br. at 9, 11.

i. November 2011 Discussions

Defendant first claims that discussions between the parties in November 2011 show that they made an oral agreement that supersedes the May 2011 Written Agreement. Def. Opp. Br. at 9. In Chou's Declaration submitted to this Court, he claims that an oral agreement was made in November 2011 *after* the May 2011 Written Agreement. D.E. 34, Chou Decl. at ¶¶ 32-35. However, looking to Chou's deposition testimony, Chou states that a concrete oral agreement was made *before* the May 2011 Written Agreement.[15] To be clear, any discussions or agreements before the May 2011 Written Agreement are barred by the parol evidence rule. "The parol evidence rule excludes evidence of antecedent negotiations or agreements to alter a subsequent writing, on the theory that such antecedent matters were integrated in the written agreement. . . . However, the rule does not exclude evidence of alterations or agreements made subsequent to the writing." *Gen. Am. Life Ins. Co. v. Int'l Ins. Co.*, 2000 WL 35547519, at *4 (D.N.J. Jan. 3, 2000).

---

[15] Chou stated in his deposition testimony that "*before* we even entered the [May 2011 Written Agreement], even *before* that date, we had verbally bonded together to make the money back from Standard Bank." Li Decl., Ex. E, Chou Deposition at p. 117 (emphases added) (D.E. 27).

According to Chou's own deposition, the parties came to an agreement *before* the May 2011 Written Agreement — any such agreement is barred by the parol evidence rule.

Defendant now essentially claims that Chou told Li about the Standard Account before the parties signed the May 2011 Written Agreement, and that after the parties signed the May 2011 Written Agreement, there were continuing discussions about the Standard Account. Plaintiff claims that the subsequent oral agreement supersedes the May 2011 Written Agreement. Def. Opp. Br. at 12. In support of this argument, Chou states in his Declaration that in November 2011, Chou had a phone call with Mr. Li and Mrs. Li in which Chou told Mr. Li "that the [Standard Account] was performing very well and that we should both be able to withdraw funds to make up for our losses. I told him I could give him $1 million now, and leave a substantial balance, or 'seed' money, in the account to try to make back the losses for both parties as quickly as possible. Mr. Li agreed. . . . [Mr. Li] told me that my strategy, which at the time was 'shorting' the price of copper, was good, and he specifically told me to 'keep doing that.'"[16] D.E. 34, Chou Decl. at ¶ 34. However, even accepting everything Defendant states as true, Defendant fails to provide evidence that the parties intended the November 2011 discussions to extinguish the May 2011

---

[16] Plaintiff claims that Chou's declaration should be barred by the "sham affidavit" doctrine. A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment. A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant. *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007).

Plaintiff claims that at Chou's deposition, he only testified to a verbal agreement before May 2011 Written Agreement, while his declaration now discusses an agreement after. However, during his deposition, Chou testified that the parties had November 2011 discussions about the hedging business, Li Decl., Ex. E, Chou Dep. p. 94, as well as discussions about the Standard Account on the golf course in September 2012, *id.* at p. 111-122. The Court finds that the differences in Chou's deposition testimony and Chou's affidavit are not enough to warrant application of the sham affidavit doctrine.

Written Agreement. Defendant fails to provide enough evidence to show a genuine issue of material fact whether these discussions show that there was an oral agreement made in November 2011 that supersedes the May 2011 Written Agreement.

## ii. September 2012 Discussions

Second, Defendant points to discussions between the parties' individual representatives in September 2012 in China as evidence that the parties formed an oral agreement that supersedes the May 2011 Written Agreement. Def. Opp. Br. at 9-10. Defendant argues that during these September 2012 discussions the parties "again discussed the performance of the [Standard Account], which both parties were relying on to make up their losses at that point. . . . Over the course of the golf outing and dinner afterwards, Mr. Chou offered to turn over the balance in the [Standard Account] to Plaintiff . . ., but Mr. Li and Mrs. Li (at the dinner) insisted that the parties maintain their joint strategy to use the account to attempt to earn back all of their losses," and that Li asked Chou to change the Standard Account to a long position strategy.[17] Def. Opp. Br. at 9-10. Again, accepting everything that Defendant states as true regarding these September 2012 discussions, Defendant fails to provide enough evidence to show a genuine issue of material fact whether these discussions show that there was an oral agreement made that supersedes the May 2011 Written Agreement.

---

[17] Chou's Declaration claims that during dinner, the parties discussed the Standard Account and that Chou "offered to turn over the [Standard Account] funds so [Li] could invest those funds himself." Chou's Declaration then states that "Mrs. Li said that she thought the account was doing well and I should just continue to invest the funds in the hedging account. I told them that I would see how the short position performed in the next few months, and if it did not gain significantly, I would make the switch, as [Li] requested, to long positions. Mr. and Mrs. Li both agreed to that strategy." D.E. 34, Chou Decl. at ¶¶ 41-42. The record is devoid of any information as to how, if at all, Mrs. Li is connected with Plaintiff or how she could make decisions that bind Plaintiff.

In short, Defendant's own information fails to show any evidence that, to the extent understandings were reached based on verbal discussion, Plaintiff agreed to extinguish the May 2011 Written Agreement. At best, the evidence shows that Plaintiff and Defendant agreed that Defendant should not liquidate the Standard Account but instead keep trading in it. Therefore, the Court grants Plaintiff's motion for summary judgment on its claim for breach of May 2011 Written Agreement.

### B. Count Two: Account Stated

Plaintiff also claims that summary judgment is appropriate on its cause of action for account stated. Plaintiff argues that the May 2011 Written Agreement, the August 2014 Letter, and the proposed November 2014 Accord and Satisfaction all clearly state the total unpaid amount owed by Defendant to Plaintiff. Pl. Br. at 15. Defendant counters that summary judgment is inappropriate on Count Two because there is a material disputed issue of fact as to the definite amount owed by Defendant to Plaintiff. Def. Opp. Br. at 16. Defendant repeats its claim that there was an oral agreement that superseded the May 2011 Written Agreement and that Plaintiff's account stated action is based on the same circumstances as its breach of contract claim. Def. Opp. Br. at 16-19.

Here, this Court has already determined that there is no genuine issue of material fact that the May 2011 Written Agreement is the operative agreement between the parties and that Plaintiff is entitled to summary judgment on its breach of contract claim. Because the Court has already granted Plaintiff's motion for summary judgment for breach of contract, the Court need not reach Plaintiff's claim for account stated because Plaintiff may only recover once. *See Carter Ledyard & Milburn LLP v. Carrascosa*, 2010 WL 3703699, at *4 (D.N.J. Sept. 10, 2010) ("In light of this Court's ruling [in favor of plaintiff on plaintiff's] breach of contract claim, the Court need not

decide [plaintiff's] account stated and quantum meruit claims, which seek the same damages.");
*see Manley Toys, Ltd. v. Toys R Us, Inc.*, 2013 WL 244737, at *5 (D.N.J. Jan. 22, 2013) (advising
that if "[plaintiff eventually] prove[s] successful on its breach of contract claim, however, it will
only be able to recover once").

### C. Prejudgment Interest

Lastly, Plaintiff argues that prejudgment interest at a 2.25% rate is just and equitable. Pl.
Br. at 15-18. Defendant counters that prejudgment interest at a 2.25% rate is inappropriate because
Defendant did not have exclusive control over the money in the Standard Account. Def. Opp. Br.
at 20-21. Defendant argues that if prejudgment interest is awarded, it should be awarded at a
0.25% rate, not a 2.25% rate, because Plaintiff has not shown that there are unusual circumstances
warranting an additional two percent rate of interest. Def. Opp. Br. at 21.

"As a federal court sitting in diversity, this Court must apply the prejudgment interest rules
of the state whose law governs the action." *Buck Consultants, Inc. v. Glenpointe Assocs.*, 2010
WL 2104982, at *2 (D.N.J. May 25, 2010) (citing *McAdam v. Dean Witter Reynolds, Inc.*, 896
F.2d 750, 773 (3d Cir.1990) ("New Jersey law controls the question of whether pre-judgment
interest is available.")). Under New Jersey law, "[a]lthough prejudgment interest in a tort action
is expressly governed by R. 4:42–11(b), 'the award of prejudgment interest on contract [] claims
is based on equitable principles.'" *Litton Indus., Inc. v. IMO Indus., Inc.*, 200 N.J. 372, 390 (N.J.
2009) (quoting *County of Essex v. First Union Nat'l Bank*, 186 N.J. 46, 61 (2006)). "Thus the
award of prejudgment interest in a contract case is within the sound discretion of the trial court.
Similarly, the rate at which prejudgment interest is calculated is within the discretion of the

court."[18] *Litton Indus., Inc.,* 200 N.J. at 390. When considering whether to award prejudgment interest, a court must primarily consider that

> the defendant has had the use, and the plaintiff has not, of the amount in question; and the interest factor simply covers the value of the sum awarded for the prejudgment period during which the defendant had the benefit of monies to which the plaintiff is found to have been earlier entitled.

*Id.* at 390 (quoting *Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 N.J. 474, 506 (1974)).

Here, the Court determines that Plaintiff is entitled to prejudgment interest. Plaintiff pre-paid Defendant $3,656,049.14 for a delivery of 500 metric tons of LME registered grade "A" copper cathodes to be delivered in December 2009. Defendant never delivered the copper cathodes and has not paid Plaintiff back the entire amount. Defendant argues that Plaintiff has failed to show that Defendant had exclusive control over the money given to it by Plaintiff—and therefore prejudgment interest is inappropriate. Def. Opp. Br. at 20-21. However, even if Plaintiff was advising Defendant on how to invest the money in the Standard Account, Defendant retained exclusive legal control over the account—evidenced by the fact that Chou made the changes to the account's holdings, even during the time that Defendant alleges Plaintiff had "control" over the account. Therefore, Plaintiff is entitled to prejudgment interest.

### 1. Interest Rate

Generally, absent unusual circumstances, the prejudgment interest rate applied to contract claims is determined by the annual rate of return of the State of New Jersey Cash Management Fund, and shall not fall below 0.25%. N.J. Ct. R. 4:42-11(a)(ii); *DialAmerica Mktg., Inc. v.*

---

[18] The date when prejudgment interest begins to run in a contract case is also within the sound discretion of the court, based on equitable principles. County of Essex v. First Union, 186 N.J. 46, 61-62 (N.J. 2006); *see* Pressler & Verniero, *Current N.J. Court Rules*, comment 3.1 on R. 4:42-11, at 1996 (2018).

*KeySpan Energy Corp.*, 374 N.J. Super. 502, 511, (App. Div. 2005); *W.R. Huff Asset Mgmt. Co. v. William Soroka 1989 Tr.*, 2009 WL 2436692, at *7 (D.N.J. Aug. 6, 2009) ("The New Jersey Appellate Division has found that in contract cases, New Jersey Court Rule 4:42–11(a)(ii)— requiring application of the New Jersey Cash Management Fund Rate for pre- and postjudgment interest in tort actions—provides an appropriate 'starting point,' absent unusual circumstances."); Pressler & Verniero, *Current N.J. Court Rules*, comment 3.1 on R. 4:42-11, at 1989, 1996 (2018). Under R. 4:42-11(a)(iii), 2% interest may be added to "judgments exceeding the monetary limit of the Special Civil Part." N.J. Court R. 4:42-11(a)(iii). New Jersey courts have advised that in contract cases "subsection (a)(ii) provides an appropriate starting point in determining the rate of prejudgment interest" and that (a)(iii)'s 2% increase is discretionary in "unusual circumstances" based on equitable principles. *DialAmerica Mktg., Inc. v. KeySpan Energy Corp.*, 374 N.J. Super. 502, 511, (App. Div. 2005) ("We thus find, in the absence of the 'unusual circumstances' to which we specifically adverted in *Benevenga*, that subsection (a)(ii) provides an appropriate starting point in determining the rate of prejudgment interest, but we do not in any sense foreclose the use of subsection (a)(iii) in connection with a rule-based calculation of prejudgment interest, should the equities demand it.").

Plaintiff relies on *W.R. Huff Asset Mgmt. Co. v. William Soroka 1989 Tr.*, 2009 WL 2436692, at *7 (D.N.J. Aug. 6, 2009) to argue that the Court should exercise its equitable discretion to award Plaintiff the additional 2% interest rate increase authorized by R. 4:42-11(a)(iii) because this case involves a large sum of money, because there were two years of litigation based on what Plaintiff calls Defendant's baseless and unreasonable defenses, and because Plaintiff's responsibility to pay financing costs and charges. Pl. Br. at 16-17. However, in *W.R. Huff Asset Mgmt. Co.*, the Court did not deviate from the starting point provided in subsection (a)(ii). *W.R.*

*Huff Asset Mgmt. Co.,* 2009 WL 2436692, at *7 (D.N.J. Aug. 6, 2009) ("The Court has considered all of the circumstances bearing upon a fair rate, including (but not limited to): the amount of judgment at issue; the length of this litigation; the reasonable rates of return that defendants might have earned; the rate of return the reserve funds actually earned; and the financial tumult that the nation has recently endured. On balance, the Court finds that New Jersey Court Rule 4:42–11(a)(ii) provides an appropriate compromise between what defendants might possibly have earned and a 'rock-bottom level' that would not provide fair compensation . . . while simultaneously preventing undue punishment against [the other party].").

The Court similarly finds that R. 4:42-11(a)(ii) provides the appropriate rate for calculating prejudgment interest in this case. Therefore, the prejudgment interest rate will be calculated by application of the historical New Jersey Cash Management Fund yearly rates, not to be less than 0.25%.[19]

### 2. Type of Interest

R. 4:42-11(a) provides that "[e]xcept as otherwise ordered by the court or provided by law, judgments, awards and orders for the payment of money, taxed costs and counsel fees shall bear simple interest." N.J. Ct. Rule 4:42–11(a). "Because compound interest unduly hastens the accumulation of debt, courts regard it as unfairly harsh and oppressive. Accordingly, compound interest is disfavored at common law." *Henderson v. Camden Cty. Mun. Util. Auth.*, 176 N.J. 554, 559 (N.J. 2003) (internal quotations and citations omitted); *Johnson v. Johnson*, 390 N.J. Super. 269, 274 (N.J. 2007) ("N.J. Ct. Rule 4:42–11(a) prescribes that any order to pay money bears simple interest. . . . [C]ompound interest is clearly the exception rather than the rule."). The Court

---

[19] Information regarding the New Jersey Cash Management Fund rate is found at http://www.nj.gov/treasury/doinvest/cash3.shtml (last visited Oct. 10, 2017 3:52 P.M.).

finds, in accordance with New Jersey courts' presumption, that prejudgment interest shall be calculated using a simple interest rate method.

### 3. Relevant Dates for Interest Calculation

Rule 4:42–11(b) states that a court may suspend prejudgment interest in a tort actions for a period of time in "exceptional cases." N.J. Ct. R. 4:42-11(b). This principle also applies to prejudgment interest in contract cases. *See North Bergen Rex Transport, Inc. v. Trailer Leasing Co., A Division of Keller Sys., Inc.,* 158 N.J. 561, 575 (N.J. 1999). "[P]rejudgment interest can be withheld only where it is demonstrated that the policy, spirit and intent of the rule are patently inapposite to the circumstances at hand." *Ruff v. Weintraub*, 105 N.J. 233, 245 (N.J. 1987) (internal quotation and citation omitted). "The exceptional cases doctrine is used to avoid punitive prejudgment interest awards." *W.R. Huff Asset Mgmt. Co. v. William Soroka 1989 Tr.*, 2009 WL 2436692, at *9 (D.N.J. Aug. 6, 2009).

Here, however, the Court finds no reason to suspend the imposition of prejudgment interest. Plaintiff requests that prejudgment interest begin to apply on November 8, 2011, Pl. Br. at 17, the day after Defendant made his last payment according to the May 2011 Written Agreement. Pl. SOMF at ¶ 44, 49. The Court finds this to be an appropriate starting point, as Defendant had already breached the agreement when it did not deliver any of the monthly payments provided for in the May 2011 Written Agreement. Therefore, Plaintiff is entitled to prejudgment interest beginning on November 8, 2011.

### 4. Applicable Amount of the Judgment

Plaintiff argues that there "is no dispute that the unpaid balance was $2,506,049.14 from November 8, 2011 until August 18, 2014 and $2,306,049.14 from August 1, 2014 until today. Pl. Br. at 17; Pl. SOMF at ¶ 44, 47. The Court finds that there is no evidence to dispute these

calculations. Therefore, prejudgment interest shall be determined using these amounts, in accordance with the New Jersey Cash Management Fund rate, discussed *supra*.

## V. CONCLUSION

For the reasons set forth above and for good cause shown, Plaintiff's motion for summary judgment on Count One for breach of contract (D.E. 25) is **GRANTED**. Plaintiff is also entitled to prejudgment interest consistent with this Opinion. The Court need not reach Plaintiff's motion for summary judgment on Count Two for account stated. An appropriate Order accompanies this Opinion.

Date: October 18, 2017

John Michael Vazquez, U.S.D.J.